UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| AARON SALTER, individually,<br><br>    Plaintiff,<br><br>  v.<br><br>DONALD OLSEN, in his individual capacity,<br><br>    Defendant. | Case No: 18-cv-13136<br>Honorable Stephanie Dawkins Davis<br>Magistrate Judge David R. Grand |

### REPORT AND RECOMMENDATION TO GRANT IN PART AND DENY IN PART DEFENDANT'S MOTION TO STRIKE DENVER BUTLER AS AN EXPERT WITNESS [28]

Plaintiff Aaron Salter was convicted of the 2003 shooting death of Willie Thomas. Salter's conviction was overturned in 2018 after he had spent fifteen years in prison. Wayne County Prosecutor Kym Worthy announced then that the case against Salter had been based primarily on mistaken identification. After his release from prison, Salter brought the instant action against defendant Donald Olsen, the lead investigator in the murder case. In support of his claims, Salter proffers the expert testimony of Denver Butler, who offers two principal opinions regarding the investigation and photographic "lineup" procedures Olsen used in the aftermath of Thomas' murder, and which resulted in Salter's arrest, conviction, and incarceration. Generally speaking, Butler's first opinion is that the "single-photo identification" lineup used by Olsen violated Detroit Police Department policy and national police practice standards, and his second opinion is that Olsen's conduct was "intentional" and "willful."

Defendant Olsen has filed a motion to strike Butler as an expert witness (ECF No. 28), and that motion was referred to the undersigned for a Report and Recommendation pursuant to 28

U.S.C. § 636(b) (ECF No. 30.) For the reasons stated below, save for a few improper statements, Butler's first opinion should be allowed because it is based on sufficient facts and data, is amply supported by Butler's extensive qualifications and experience, and will aid the jury in understanding the evidence. However, Butler's second opinion should be disallowed because it impermissibly opines on a legal issue. Accordingly, Olsen's instant motion should be granted in part and denied in part as specified below.

### A.     BACKGROUND

This case arises out of a 2003 shooting investigation, which led to plaintiff Aaron Salter ("Salter") spending over fifteen years in prison for a second-degree murder conviction. (ECF No. 32, PageID.529.) That conviction was overturned – and Salter released – in 2018. (*Id.*) According to Salter, Wayne County Prosecutor Kym Worthy announced then that the case against Salter had been based primarily on mistaken identification. (*Id.*, PageID.530.) Salter brings this action against defendant Donald Olsen, the lead investigator in the 2003 case, under 42 U.S.C. § 1983.

Salter's overturned murder conviction stemmed from an August 6, 2003, shooting that left Willie Thomas dead and Jamar Luster hospitalized. (*Id.*, PageID.529.) Olsen responded to the scene of the shooting and later spoke with Luster at the hospital. (ECF No. 28, PageID.337.) Luster would prove to be the lone witness used to convict Salter. (ECF No. 32, PageID.529.) Witnesses described two shooting suspects to Olsen. (ECF No. 28-1, PageID.353.) Luster, in particular, indicated to Olsen that one of the two shooters Luster witnessed was "Rob." (ECF No. 32, PageID.529.) Luster described Rob as 5'7 and weighing 150 to 170 lbs. with "Lt. Brn. Compl., mustache, thin beard, low cut hair, dark clothing." (ECF No. 28-1, PageID.353.) The second suspect was described as "B/M 20's, 6'0", thin build, white t-shirt, N.O.D." (*Id.*) Olsen went to the Ninth Police Precinct Station and, on "a hunch," pulled a single photo to present to Luster to

provide an identification. (*Id.*; ECF No. 36-5, PageID.771-72.) The photo Olsen pulled was of Salter, who, at the time, stood 6'4 and weighed 250 lbs. (ECF No. 28-1, PageID.353.) After Luster returned home from the hospital, Olsen showed him the photograph and asked if the pictured individual was the shooter. (ECF No. 32, PageID.529.) Luster responded affirmatively. (ECF No. 28, PageID.337.) After obtaining the positive identification from Luster, Olsen filled out and submitted his report to the prosecutor's office. (*Id.*, Page ID.338.) A warrant was issued for Salter's arrest, and he was convicted based on Luster's identification. (*Id.*; ECF No. 1, PageID.8.)

After spending 15 years in prison, a later investigation revealed that Salter had been wrongly convicted based on issues surrounding Luster's identification. According to Salter, in a press release announcing her decision in 2018 to dismiss all charges against Salter, Wayne County Prosecutor Kym Worthy explained:

> It has been determined that the case against Mr. Salter was based primarily on mistaken identification by the main witness in the case. I am pleased to announce today that this 15-year old homicide conviction against Aaron Salter will finally be dismissed. The system failed him. Nothing I can say will bring back the years of his life spent in prison. Justice is truly being served today. We will recommend to the Michigan Attorney General's Office that Mr. Salter receive wrongful conviction compensation. We sincerely wish him well.

(ECF No. 1, PageID.11.)[1]

Salter then brought this lawsuit pursuant to 42 U.S.C. § 1983, against the City of Detroit and Olsen, claiming a violation of his constitutional rights, as well as a claim of malicious prosecution. The City was dismissed by stipulation, leaving Olsen as the sole defendant. Luster testified that had he known Salter was 6'4, 250 lbs. when Olsen showed him Salter's photograph,

---

[1] Salter provided this quote in his complaint, and he refers to it in his briefing on the instant motion (ECF No. 32, PageID.530.) Olsen does not seem to dispute the quote, though the press release itself does not appear to be in the record.

3

he would not have identified Salter as the shooter because Salter's size was so different than Luster's recollection of the shooter's size. (ECF No. 36-7, PageID.787.)

To prevail on his § 1983 claim, Salter must show that his constitutional rights were deprived by Olsen while Olsen was acting under color of law. 42 U.S.C. § 1983. The parties seem to agree that the issue of "intentionality" and "willfulness" are important ones to Salter's claims under the Constitution. In his complaint, Salter alleges that he was detained without probable cause, charged with crimes he did not commit, wrongfully convicted and imprisoned, and deprived of his liberty for over fifteen years as a result of Olsen's "willful violation of his constitutionally-protected rights . . ." (ECF No. 1, PageID.15.) Salter also alleges that "Olsen's conduct was malicious and so willful and wanton as to demonstrate a reckless disregard of [Salter's] rights and would readily inspire feelings of humiliation, outrage, and indignity, such as would warrant exemplary damages." (*Id.*, PageID.17.) In his motion for summary judgment, Olsen admits that although "[a]n arrest pursuant to a facially valid warrant is normally a complete defense to a federal constitutional claim for false arrest made pursuant to 42 U.S.C. § 1983 . . . a police officer cannot rely on a facially valid warrant if he or she made intentional or reckless misrepresentations or omitted information which but for the misrepresentations or omissions, probable cause would not have been found." (ECF No. 29, PageID.374-75) (citing *Volticky v. Village of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005) and *Baker v. McCollan*, 443 U.S. 137, 143-44 (1979)).

In an apparent effort to establish not only that Olsen violated various police practice standards, but that he did so "intentionally" and/or "willfully," Salter proposes to offer the opinion testimony of a retained expert witness, retired Louisville Police Department homicide investigator Denver Butler. Butler offers two principal opinions. First, he opines that "[t]he [s]ingle-[p]hoto identification of Mr. Salter made by Mr. Luster was unnecessary and unduly suggestive, violating

4

Detroit Police Department[] policy and well-established [n]ational [s]tandards." (ECF No. 28-1, PageID.354.)  Second, Butler opines that Olsen "deliberately" "chose not to thoroughly investigate the murder of Mr. Thomas and made intentional choices that resulted in the wrongful conviction of Mr. Salter," and that Olsen's "decisions regarding the photo identification and not turning over evidence to the prosecutor can only be considered intentional" and "willful."  (*Id.*, PageID.355-57.)

In his instant motion, Olsen asks the Court to find Butler's opinions inadmissible and strike Butler as an expert witness because the testimony: (1) is not based on scientifically valid methodology or reasoning, and (2) lacks reliability because it was prepared solely for litigation. (ECF No. 28.)

## B.    LEGAL STANDARDS

Federal Rule of Evidence 702 governs the admissibility of expert testimony, and provides that "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, (b) the testimony is based on sufficient facts or data, (c) the testimony is the product of reliable principles and methods, and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.  The Supreme Court has instructed that Rule 702 requires district courts to ensure that expert testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. 579, 597. The rule imparts a "gatekeeping" responsibility on district courts to exclude unreliable and irrelevant expert testimony from trial. *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260 (6th Cir. 2001) (quoting *Daubert*, 509 U.S. at 597).

As subsection (a) to Rule 702 provides, to be admissible, expert testimony must *assist* the trier of fact in *understanding* the evidence or determining a material fact in question. Fed. R. Evid. 702(a); *see also Daubert*, 509 U.S. at 592–93.  For that reason, courts must guard "against the admission of opinions which would merely tell the jury what result to reach." Fed. R. Evid. 704 Advisory Committee Note.  Like all relevant evidence, otherwise admissible expert opinion testimony may still be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Federal Rule of Evidence 704 abolishes the "ultimate issue" rule which precluded opinion testimony merely because it embraced an ultimate issue. Fed. R. Evid. 704. ("An opinion is not objectionable just because it embraces an ultimate issue."). However, the Advisory Committee Notes specifically warn that the rule "does not lower the bar[] so as to admit all opinions," because "[u]nder Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time." Fed. R. Evid. 704 Advisory Committee Note. The notes go on: "These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach . . . ." *Id.* The difference between an expert testifying to crucial facts or circumstances and testifying to a legal conclusion is nuanced but important. "We would not allow a fingerprint expert in a criminal case to opine that a defendant was guilty (a legal conclusion), even though we would allow him to opine that the defendant's fingerprint was the only one on the murder weapon (a fact)." *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994). Where the expert's opinion amounts to merely defining legal terms and telling the jury whether certain conduct violated or was consistent with those legal terms, that testimony is impermissible. *Id.*

6

**C.     ANALYSIS**

*i.     Opinion #1 – Butler May Testify that the Single-Photo Identification Violated Detroit Police Department Policy and Well-Established National Standards*

Butler first opines that "[t]he [s]ingle-[p]hoto identification of Mr. Salter made by Mr. Luster was unnecessary and unduly suggestive, violating Detroit Police Department[] policy and well-established [n]ational [s]tandards." (ECF No. 28-1, PageID.354.) In challenging this opinion, Olsen leans heavily on the five-factor inquiry set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and asks this court to determine the admissibility of Butler's testimony based on "(1) whether [his] methodology has been tested, (2) whether [his] methodology has been subject to peer review and publication, (3) [his] methodology's rate of error, (4) the existence and maintenance of standards controlling its operation, and (5) whether it has attracted widespread acceptance within a scientific community." (ECF No. 28, PageID.340); *see Daubert*, 509 U.S. at 593–94. In short, Olsen argues that Butler's conclusions are not based in any scientific reasoning and do not have scientific validity. This argument lacks merit.

Not all expert opinions are susceptible to scientific and methodological testing that can be replicated in a lab or confirmed through empirical analysis. The Sixth Circuit amply explained this principle in *First Tennessee Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 334 (6th Cir. 2001). In that case, the plaintiff bank had sued the Administrator of the Small Business Administration claiming that the SBA broke a contractual obligation to repurchase a defaulted loan. At trial, the SBA offered the expert testimony of a banker, Peter Iorlano, who opined about conduct of the bank that he believed ran contrary to accepted practice. The SBA prevailed, and on appeal the bank argued that Iorlano's testimony should have been excluded at trial because it "was not based upon 'technically valid reasoning or methodology.'" The Sixth Circuit flatly rejected that

7

argument, explaining that Iorlano's testimony was not the type to which the typical *Daubert* factors apply:

> Contrary to [the bank's] argument, the fact that Iorlano's opinions may not have been subjected to the crucible of peer review, or that their validity has not been confirmed through empirical analysis, does not render them unreliable and inadmissible. In *United States v. Jones*, 107 F.3d 1147, 1158 (6th Cir.) [], this court recognized that the four specific factors utilized in *Daubert* may be of limited utility in the context of non-scientific expert testimony. We noted that "[i]f [the *Daubert*] framework were to be extended to outside the scientific realm, many types of relevant and reliable expert testimony—that derived substantially from practical experience—would be excluded. Such a result truly would turn *Daubert*, a case intended to relax the admissibility requirements for expert scientific evidence, on its head." *Id.* at 1158. . . . *Daubert* is "only of limited help" in assessing technical or experiential expertise. [] Consequently, in *Jones* we declined the appellant's invitation to apply the factors outlined in *Daubert* to testimony involving a non-scientific field. *Jones*, 107 F.3d at 1158.
>
> Following our ruling in Jones, the Supreme Court clarified the applicability of the so-called "*Daubert* factors" to non-scientific evidence in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 []. In *Kumho*, the Court reaffirmed *Daubert's* central holding that a trial judge's "gatekeeper" function applies to all expert testimony, regardless of whether such testimony is based upon scientific, technical, or other specialized knowledge. *Id.* at 141, 147–49 []. With respect to the individual factors enumerated in *Daubert*, the *Kumho* Court held that trial courts may consider such factors when assessing the reliability of all types of expert testimony. *Id.* at 149–52 []. The Court stressed, however, that "*Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id.* at 141 []. In some cases (even cases involving non-scientific expert testimony), the factors may be pertinent, while in other cases "the relevant reliability concerns may focus upon personal knowledge or experience." *Id.* at 150 []. "[W]hether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* at 153 [].
>
> After reviewing Iorlano's trial testimony, we cannot say that the district court abused its discretion by allowing him to testify as an expert witness. In reaching this conclusion, we find the *Daubert* reliability factors unhelpful in the present case, which involves expert testimony derived largely from Iorlano's own practical experiences throughout forty years in the banking industry. Opinions formed in such a manner do not easily lend themselves to scholarly review or to traditional scientific evaluation. Consequently, we

> find no merit in [the bank's] argument that Iorlano's testimony lacked sufficient indicia of reliability, and therefore was inadmissible, under the guidelines established by *Daubert*. The fundamental objective when considering the admissibility of "expert" testimony is "to ensure the reliability and relevancy" of that testimony. *Id.* at 152 []. As set forth above, the district court possessed an adequate basis for concluding that Iorlano's testimony was both reliable and relevant.

*First Tennessee*, 268 F.3d at 334–35 (some internal citations omitted).

Using similar logic, courts have permitted qualified experts to testify about discrete police-practice issues when their testimony will aid the trier of fact. For example, in *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 908 (6th Cir. 2004), the Sixth Circuit noted that "Courts have permitted experts to testify about discrete police-practice issues when those experts are properly credentialed and their testimony assists the trier of fact." In that case, the police practices expert's testimony was deemed admissible because the expert "had considerable experience in the field of criminology and because he was testifying concerning a discrete area of police practices about which he had specialized knowledge . . ." *Id.* at 909. *See also United States v. Eberle*, No. 08-20139, 2008 WL 4858438, at *3 (E.D. Mich. Nov. 10, 2008) ("[e]xpert witnesses may offer testimony as to specific issues, including . . . whether [a] [d]efendant's conduct violated specific police standards or practices and . . . opinions as to whether specific actions taken by [a] [d]efendant were warranted under the circumstances presented.").

Given these standards, it is clear that Butler's first opinion is generally admissible. Homicide investigation is an appropriately specific and substantiated field of expertise, and Butler is well-qualified to offer an opinion about whether Olsen's conduct during the murder investigation – including showing a single photo of Salter to Luster – comported with relevant professional standards.

9

During his more than twenty-year career with the Louisville Police Department, Butler investigated hundreds of homicides and created the Louisville Metro Police Department's Cold Case Homicide Unit, where he investigated or managed the investigations of over 600 cases. (ECF No. 28-1, PageID. 351.)  He also served as a member of the Kentucky General Assembly and proposed and passed legislation to improve the criminal justice system.  (*Id.*)  Butler assisted in many exonerations of wrongful homicide convictions and developed and implemented policies to address the causes of such. (*Id.*)  Finally, as an executive member of the Kentucky Justice and Public Safety Cabinet, Butler "developed and implemented policies to address causes of wrongful convictions." (*Id.*)  In short, Butler has the requisite experience and knowledge of police practices as they relate to homicide investigations to reliably opine on the subject at hand.[2]

Additionally, Butler's opinion will assist the jury in understanding standard police investigation practices and how the failure to follow them can potentially result in a wrongful conviction.  Butler provides the Detroit Police Department and national standards that he believes applied to Olsen's conduct, including that "[w]itnesses should never be shown only a photograph of the suspect" and "[s]imilarity of features of the suspect, with other persons appearing in the photographs . . . are important." (*Id.*, PageID.355.)  He also notes that the policy states that

---

[2] For these same reasons, Olsen's argument that "Butler's expert testimony lacks reliability because it is prepared solely for this litigation" lacks merit.  (ECF No. 28, PageID.346.)  The main case Olsen relies on, *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434 (6th Cir. 2007), made clear that added caution was warranted in evaluating "expert testimony prepared solely for purposes of litigation, as opposed to testimony flowing naturally from an expert's line of scientific research or technical work . . ."  The court further explained that in such cases, "the party proffering the expert must show some objective proof . . . supporting the reliability of the expert's testimony." *Id.* at 435.  While Olsen is certainly free to question Butler about the fact that he was retained to provide testimony in this case, and about any biases Olsen perceives Butler may have, as explained above, Butler's opinions are simply not the type that are susceptible to "objective proof." Accordingly, the mere fact that Butler prepared his expert report solely for this litigation is not a basis for excluding his testimony at trial.

10

"[m]embers shall strictly adhere to this directive in order to maximize the reliability of identifications, minimize unjust accusations, and conform to established legal procedures." (*Id.*) Butler goes on to describe facts from depositions and exhibits in this case to demonstrate the information that was available during the investigation including the height and weight description of "Rob," that "Rob" was in the hospital just before the shooting, that "E" had been identified as a shooter in a previous incident, and that the technology available to police at the time should or would have given an appropriate physical description of Salter (*Id.*) Butler also explained how the kinds of violations he accuses Olsen of impact the ability of a prosecutor to fairly perform her job: "Not providing the prosecutor the full details of how the evidence was obtained misleads the prosecutor and does not allow him or her to objectively weigh whether probable cause for an arrest warrant exists." (*Id.*, PageID.354.) Again, because homicide investigation is likely a subject that "the average person is unlikely to have any experience or understanding of from their own background," *Sanford v. Russell*, 387 F. Supp. 3d 774, 790 (E.D. Mich. 2019), this testimony will assist the jury in understanding the significance and potential consequences of Olsen's alleged conduct.

In sum, Butler's opinion that "[t]he [s]ingle-[p]hoto identification of Mr. Salter made by Mr. Luster was unnecessary and unduly suggestive, violating Detroit Police Department[] policy and well-established [n]ational [s]tandards" should be allowed because it is based on sufficient facts and data, supported by a proper foundation in terms of Butler's qualifications and experience, and will aid the jury in understanding the evidence.

There are, however, a few aspects of Butler's proposed testimony related to his first opinion that he should not be allowed to offer. In describing the "Professional Homicide Investigative Standards," Butler writes:

> [R]elying entirely on a shooting victim's flawed identification of a single photo shown by investigators, as a basis for police presenting a homicide charge to prosecutors, is an indication of an unprofessional and objectively unreasonable investigation. . . . No reasonably trained police officer would skew the evidence to manufacture probable cause where it would not exist otherwise. . . .

(*Id.*)

Butler should not be permitted to offer this testimony. In a point the Court discusses in more detail below with respect to Butler's second opinion, the law is clear that it is improper for an expert to opine on an issue of law. This includes whether a police officer's conduct was "objectively reasonable." Very recently, in *Gerling v. City of Hermann, Missouri*, No. 4:17-CV-02702 JAR, 2019 WL 7048972, at *5 (E.D. Mo. Dec. 20, 2019), the court explained, "While expert opinions can embrace the ultimate issue of fact . . . including whether standards or practices are applicable to a given situation and whether those standards or practices were met in the situation [under Federal Rule of Evidence 704] . . . an expert cannot testify that following or failing to follow certain standards met or failed to meet the applicable legal standard, such as the reasonableness of [the defendant officer's] actions." *Id.* (citation omitted). *See also Becker v. City of Evansville*, No. 312CV00182TWPMPB, 2016 WL 6395868, at *6 (S.D. Ind. Oct. 28, 2016) (disallowing expert testimony as to whether a police officer acted in an "objectively reasonable" manner); *Elex v. Glirbas*, No. CIV. 12-3206 ADM/JJK, 2014 WL 2462811, at *8 (D. Minn. May 29, 2014) ("An expert's opinion on the reasonableness of police conduct in light of Fourth Amendment standards is an impermissible legal conclusion and is not admissible."). Thus, Butler should be precluded from testifying that Olsen's conduct was not "objectively reasonable."

Butler should also be precluded from testifying in a manner that could reasonably be interpreted as him opining that Olsen attempted to "skew" the evidence to "manufacture" probable cause. Using that verbiage is tantamount to Butler testifying that it is his opinion that Olsen

12

"intentionally" or "willfully" violated Salter's rights, and for the reasons explained below, such testimony is not permissible. At any rate, this particular aspect of Butler's testimony which is more hyperbole than factual analysis, is more prejudicial than probative. Fed. R. Evid. 403. That is reason enough to disallow it. *Id.*

        ii.        *Opinion #2 – Butler May Not Testify that Olsen Acted "Intentionally" or "Willfully"*

Butler's second opinion is that Olsen "deliberately" "chose not to thoroughly investigate the murder of Mr. Thomas and made intentional choices that resulted in the wrongful conviction of Mr. Salter." (ECF No. 28-1, PageID.355.) After identifying what he characterized as a "very limited . . . investigation," (*id.*, PageID.355–56), Butler also opines that Olsen's "decisions regarding the photo identification and not turning over evidence to the prosecutor can only be considered intentional" and "willful." (*Id.*, PageID.355-56.) Butler identifies several points that led him to this conclusion: (1) "incomplete and misleading investigative reports," (2) a "failure to articulate and write down how Mr. Salter became a person of interest," (3) the "intentional and willful ruling out of alternative suspects," (4) the decision "not to disclose exculpatory information," (5) the decision "not to tell the prosecutor that the alternate suspect was . . . 'E,'" (6) the decision "not to tell the warrant prosecutor that . . . 'E' . . . matched the description of the second shooter," and (7) the decision "not to tell the . . . prosecutor that Luster picked out two or three people as shooters when shown the photo lineup." (*Id.*) Butler concludes that Olsen must have "deliberately and intentionally chose not to investigate" properly because "[n]o reasonably well-trained and competent investigator would have chosen not to investigate the most concrete leads." (*Id.*, PageID.357.)

Even if Butler's opinion could be said to logically flow from the evidence he cites, his testimony is impermissible because a police practices expert witness may not testify about a legal

13

conclusion with respect to a police officer's conduct.  In *Alvarado v. Oakland County*, this court recognized the difference between "expert testimony regarding recognized police policies and procedures" and "legal conclusions based on [the expert's] interpretation of the application of those policies." 809 F. Supp. 2d 680, 690 (E.D. Mich. 2011). There, the expert was permitted to testify as to the sheriff department's policies and procedures to assist the jury in coming to its own conclusion about the reasonableness of the deputy's actions. However, the expert himself was not allowed to testify whether the deputy's conduct was reasonable or unreasonable because that decision was the jury's alone to make. *Id.* at 691.  Similarly, the Sixth Circuit explained in *Berry v. City of Detroit*:

> The expert can testify, if a proper foundation is laid, that the discipline in the Detroit Police Department was lax. He also could testify regarding what he believed to be the consequences of lax discipline. He may not testify, however, that the lax discipline policies of the Detroit Police Department indicated that the City was *deliberately indifferent* to the welfare of its citizens. . . . Furthermore, "deliberate indifference" is a legal term, as the questioning of [the expert] indicated. It is the responsibility of the court, not testifying witnesses, to define legal terms. The expert's testimony in this regard invaded the province of the court.

25 F.3d 1342, 1353 (6th Cir. 1994) (emphasis in original).  *See also Hygh v. Jacobs*, 961 F.2d 359 (1992) (rejecting expert testimony that would "communicat[e] a legal standard.").

Cases not involving police practices are also instructive.  For example, in *Woodard v. Curtin*, No. 13-CV-15120, 2014 WL 5847588, at *17 (E.D. Mich. Nov. 12, 2014), a state habeas petitioner had been convicted of first degree child abuse, which required the jury to find that he caused physical harm to a child "intentionally or knowingly." A doctor opined during the petitioner's criminal trial "that the victim's injuries were indicative of physical abuse, [] that the victim suffered 'abusive head trauma,' [] and that the victim suffered 'physical abuse.'" *Id.* In rejecting the petitioner's argument that the doctor's opinion was objectionable, the court explained,

14

"These medical opinions, however, were proper subjects of expert testimony, and did not usurp the jury's role in deciding the legal questions of . . . whether petitioner caused this serious physical harm 'intentionally or knowingly.'" *Id.* Implicit in this ruling is that it would have been impermissible for the doctor to have opined that the petitioner acted "intentionally" or "willfully." *Id.* In *Nationwide Transport Finance v. Cass Information Systems, Inc.*, the Ninth Circuit affirmed a ruling that testimony "label[ing] the parties' actions as 'wrongful' or 'intentional' under the law" was impermissible because it instructed the jury on legal issues. 523 F.3d 1051, 1058 (9th Cir. 2008). However, testimony related to "'industry conditions, standards, and practices,' as well as 'factual corporate norms'" was allowed. *Id.*

Thus, even if Butler provided a reasonable analysis of Olsen's conduct based on the evidence, his opinion as to whether such acts were *intentional* or *willful* is the jury's alone to make because those are some of the legal conclusions at issue in the case. Since "it is the responsibility of the court, not testifying witnesses, to define legal terms[,] [t]he expert's testimony in this regard invade[s] the province of the court." *Berry,* 25 F.3d. 1342, 1353–54. "An expert can 'suggest the answer[s]' to legal questions and 'give the jury all the information' it needs to come to legal conclusions of its own," *United States v. Melcher*, 672 F. App'x 547, 552 (6th Cir. 2016) (quoting *Berry,* 25 F.3d 1342, 1353), but he may not offer an opinion as to that ultimate legal conclusion.

Finally, the Court notes that nothing in the recent Eastern District of Michigan case of *Sanford*, 387 F. Supp. 3d 774, cited by Salter, changes the above analysis. In that case, the court explained, "[t]estimony by police practices experts routinely is admitted in civil rights litigation for its bearing on such matters as (1) whether an officer's repeated deviations from accepted standards of police practices suggests that his conduct was intentional or pursued recklessly in disregard of the plaintiff's rights . . ." *Sanford*, 387 F. Supp. 3d at 790. Expert testimony that

15

*bears on* the question of whether a police officer acted "intentionally" is very different from an expert *directly* testifying that the police officer acted "intentionally." Indeed, the expert witness in *Sanford* had *not* opined that the police officer acted "intentionally," but rather merely proffered testimony that the officer's investigation "featured several 'departures from minimally acceptable police practices.'" *Id.* at 788. While that testimony could be offered to aid the jury in deciding the legal issue of intentionality, testimony as to the legal issue itself is impermissible. *See*, *e.g.*, *Berry*, 25 F.3d 1342, 1353.

For all of these reasons, Butler should not be allowed to offer his second opinion.

**D.     CONCLUSION**

For the reasons set forth above, **IT IS RECOMMENDED** that Olsen's Motion to Strike Denver Butler as an Expert Witness (**ECF No. 28**), be **GRANTED IN PART AND DENIED IN PART** as specified above.

Dated: May 30, 2020                                                    s/David R. Grand
Ann Arbor, Michigan                                                    DAVID R. GRAND
                                                                       United States Magistrate Judge

**NOTICE TO THE PARTIES REGARDING OBJECTIONS**

The parties to this action may object to and seek review of this Report and Recommendation but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and

Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.  A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 8, 2020.

s/Eddrey O. Butts<br>
EDDREY O. BUTTS<br>
Case Manager