UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AARON SALTER,                                          Case No. 18-13136

        Plaintiff,                                     Stephanie Dawkins Davis
v.                                                     United States District Judge

DONALD OLSEN,

        Defendant.

_____ /

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 29)

## I.    INTRODUCTION

In 2003, Plaintiff Aaron Salter was convicted of one count of first-degree murder, two counts of assault with intent to murder, and one count of felony-firearm.  (ECF No. 1, PageID.8).  He was sentenced to serve life in prison without the possibility of parole.  *Id*. at PageID.9.  A team of lawyers and investigators from the Federal Defender Office (FDO) represented Salter in his federal habeas proceeding.  While they were unable to obtain habeas relief for Salter, they uncovered previously undisclosed evidence and interviewed witnesses who confirmed Salter's alibi at the time of the shooting for which he had been convicted.  *See* Press Release dated 8/15/18 from Wayne County Prosecutor Kym Worthy, https://www.waynecounty.com/articles/press-release-august-15-2018-

prosecutor-worthy.aspx (last accessed 4/28/22).[1]  They also interviewed the sole

eyewitness from Salter's trial, who stated that he was never certain Salter was the

shooter.  *Id*.  In 2013, a prisoner contacted the FDO attorneys claiming to have

personal knowledge of the shooting.  *Id*.  The FDO attorneys followed up on that

lead, then hired a former FBI polygrapher, to subject Salter to a polygraph

examination, which he passed.  *Id*.  After Salter's requests for habeas relief were

denied, the FDO attorneys sought from the Wayne County Prosecutor's Office

newly formed Conviction Integrity Unit (CIU).  *Id*.

　　In 2018, both the CIU and Salter's counsel began investigating his claim of

innocence.  (ECF No. 1, PageID.11).  Once the investigation was complete, the

criminal charges against Salter were dismissed.  *Id*.  The Wayne County

Prosecutor, issued the following statement:

> The Aaron Salter case has been thoroughly reviewed,
> investigated, and considered. It has been determined that
> the case against Mr. Salter was based primarily on
> mistaken identification by the main witness in the case. I
> am pleased to announce today that this 15-year old

---

[1]  The press release is cited and quoted in Salter's complaint.  (*See* ECF No. 1, PageID.11).  The court does not rely on the press release for the truth of the matters asserted therein nor does the court rely on the facts set forth in the press release in the substance of its decision below.  Instead, the court refers to the press release only for background and context of the pre-suit procedural history that lead to the overturning of Salter's conviction.  *See e.g.*, *Holder v. Enbridge Energy, L.P.*, 2011 WL 3878876, at *5 (W.D. Mich. Sept. 2, 2011) (Court considered newspaper article referenced in the plaintiff's complaint as "helpful background and context to Plaintiff's claims," even if not admissible at trial.); *Yarborough v. City of Warren*, 383 F. Supp. 676, 682 (E.D. Mich. 1974) (Newspaper articles received in evidentiary hearing for purpose of background on the events at issue in civil rights action, not for the truth of the matters asserted therein.).

> homicide conviction against Aaron Salter will finally be
> dismissed. The system failed him. Nothing I can say will
> bring back the years of his life spent in prison. Justice is
> truly being served today. We will recommend to the
> Michigan Attorney General's Office that Mr. Salter
> receive wrongful conviction compensation. We sincerely
> wish him well.

*Id.*; *see also* https://www.waynecounty.com/articles/press-release-august-15-2018-prosecutor-worthy.aspx (last accessed 4/28/22).

Subsequently, Salter filed this lawsuit against the City of Detroit and retired police investigator Donald Olsen, who worked for the Detroit Police Department ("DPD").  (ECF No. 1).  He raises several constitutional claims under 42 U.S.C. § 1983 and a state law claim.  Count I alleges Fourth Amendment violations for fabrication of evidence, false arrest, and malicious prosecution as well as Fifth Amendment violations for withholding exculpatory material under *Brady v. Maryland*, 373 U.S. 83 (1963) and an unnecessarily suggestive identification. Count II alleges a Michigan malicious prosecution claim.

Once discovery closed, Olsen filed a motion for summary judgment, (ECF No. 29), which has been fully brief and is now ready for determination.  For the reasons set forth in this opinion, Olsen's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

## II.    FACTS

On August 6, 2003, around 1:20 a.m., Jamar Luster was sitting on the front

porch of a home on Parkgrove Street in Detroit, Michigan, with his friends, Kimberly Allen and Michael Payne.  (ECF No. 29, PageID.367).  The group was hanging out, drinking, and "getting high."  (ECF No. 36-7, PageID.780).[2]  In the midst of it, Luster heard a gunshot, looked to his right and saw two shooters moving slowly toward them.  (ECF No. 29-2, PageID.414, ECF No. 36-11, PageID.841).  Although it was dark outside, he noted that at least one of the shooters, whom he later identified as Salter, was under a streetlight.  (*Id.* at 843).  The shooters were about 35 to 40 feet away from Luster.  (ECF No. 36-9, PageID.814).  One of the shooters was a smaller man with a pistol; the other a taller, thicker man with a long gun.  (ECF No. 29-2, PageID.414, ECF No. 36-11, PageID.839).  Luster and Payne both suffered gunshot wounds during the melee.  After he was shot, Luster jumped over the bannister of the porch, laid down, and then crawled away.  (ECF No. 36-11, PageID.841, 843).  According to Luster, he "wasn't tryin' to look for nobody, [he] was tryin' to get out the way."  (*Id.* at PageID.842).  Both Luster and Payne were taken to the hospital.  (ECF No. 29, PageID.367).  Another man who was near the porch died of his gunshot wound.  (*Id.*)

Olsen, who was new to the DPD (ECF No. 36-18, PageID.930), responded

---

[2] At the preliminary examination, however, Luster testified that he was neither drinking nor under the influence of drugs.  (ECF No. 36-9, PageID.824).

to the scene of the shooting.  (ECF No. 29, PageID.367).  Later, around 5:20 a.m., he spoke to Luster at the hospital.  (ECF No. 29-5, PageID.421).  Luster gave a statement in which he relayed that one of the guys who shot him was named "Rob."  (ECF No. 36-2, PageID.724).  He described Rob as a black male, 26 to 27 years old, five feet seven inches tall, 150 to 170 pounds, light brown complexion, with a thin beard and low cut hair, wearing dark clothing.  (*Id.*).  Luster explained that he knew Rob from the neighborhood because of "all the shit he be starting." (*Id.* at PageID.725).  In particular, he said that earlier in the day, Rob was with a group of others who had driven by the house where he was shot, waving a gun at six other men.  (*Id.*).  Regarding the second shooter, Luster said he had never seen him before; all he could say about him was that "he's thin firing a gun."  (*Id.*). Luster also noted that a guy named "E" (Earland Collins) had shot up the house about a month before.  (*Id.* at PageID.726).  Luster made a second statement to DPD Officer Joseph Diabliz while at the hospital.  In the second statement, he described Rob as "b/m/20's, 5'7", thin build, med. complex., short afro, wearing all black.  Known to frequent the area of Pelkey/Linnhurst.  Known to drive a 'beat up' peach cutlass."  (ECF No. 36-3, PageID.728).  He described the second shooter as "b/m/20's, 6'0", thin build, white t-shirt, N.O.D."  (*Id.*).  Luster was discharged from the hospital after a couple of hours and went home.  (ECF No. 29, PageID.367).

At some point after speaking with Luster, Olsen went to the 9th Precinct to do some research on the case. (ECF No. 36-4, PageID.750). Olsen found a photo of Salter, and for reasons he could not recall during his deposition, Olsen selected Salter as the possible "Rob" referred to by Luster. (*Id.*) Notably, at Salter's preliminary examination, which was much closer in time to the events that transpired, Olsen testified that he had a "hunch" that Salter was the shooter because Luster had told him "that he had seen the person before on a few occasions" and, in trying to surmise who he was talking about, Olsen came up with that photo. (ECF No. 36-5, PageID.771–72).

Once Luster was released from the hospital, Olsen went to Luster's home and took yet a third statement. He told Luster that the police had picked up the guy with the rifle. (ECF No. 36-7, PageID.799). Afterward, Olsen showed Luster the single black and white mug shot of Salter that he had retrieved from the station, and Luster identified Salter as the "Rob" who shot him. (*Id.*; ECF No. 36-6, PageID.774). While Salter was 6'4" tall and 250 pounds (ECF No.36, PageID.683–84), not 5'7" and 150-170 pounds as Luster had described "Rob," Olsen says he was unaware of Salter's height or weight when he showed Luster the photo. (ECF No. 36-4, PageID.751).

After showing Luster the single photo of Salter, Olsen then showed Luster a photo array containing six other mug shots that did not include Salter. (ECF No.

36-5, PageID.770-771).  At Salter's preliminary examination after he had been charged criminally, Olsen testified that Luster did not identify any of the six as "responsible for the shooting," (ECF No. 36-5, PageID.771); Luster, on the other hand, testified during that same hearing that he had picked two people from the array as shooters.  (ECF No. 36-9, PageID.830).  And at his deposition in this case, Luster testified that he picked "E" out of the photo array as a shooter and told Olsen that "E" was one of the shooters.  (ECF No. 36-7, PageID.786, p. 38).

Based on Luster's identification of Salter in the single photo show up, Olsen filled out an investigator's report and submitted it along with the homicide file to the prosecutor's office.  (ECF No. 29, PageID.369; ECF No. 29-9, PageID.466). The Assistant Prosecuting Attorney in Wayne County recommended an arrest warrant for Salter.  On September 9, 2003, a judge issued a warrant for Salter's arrest.  (ECF No. 29, PageID.369).

A few weeks later, at the preliminary examination, only Luster and Olsen testified.  Luster described the events surrounding the shooting and again identified Salter as one of the two shooters.  (ECF No. 36-9, PageID.813).  Luster testified that Salter looked like "the tall one" with the "long gun."  (*Id.* at PageID.814). Repeating what he had said to Olsen at the hospital, he also testified that he had seen Salter "once or twice" before, including when Salter drove by the house waiving a gun earlier on the day of the shooting.  (*Id.* at PageID.818–19).  Luster

also testified that he was shown a photo array of five or six photos and picked two

people out as the shooters; at the time, Luster testified that "the two people I

picked out was him and the other guy, Rob, or whatever" and that "two out of the

five [he] picked out are the two people that shot [him]."  (*Id.* at 830).  Olsen also

testified briefly about his process for showing the photos to Luster, explaining that

he first showed Luster a single photo of Salter then a six-photo array that did not

include Salter.  (ECF No. 36-5, PageID.771).  He stated that Luster did not identify

any of the people in the photo array as having been responsible for the shooting.

(*Id.*).  He also acknowledged that he could have prepared a photo array with

Salter's picture in it.  (*Id.*).

At the end of the preliminary examination, Salter's trial attorney, Lyle

Harris, moved to suppress Luster's identification because Olsen showed him the

photo "without doing a photo show-up."  (ECF No. 29-8, PageID.463).  Harris

argued that Olsen "should have done a photo array with Mr. Salter's picture in

there."  (*Id.*).  The prosecutor responded that Luster said he knew Salter and had

"seen him in the past."  (*Id.* at PageID.464).  The trial court denied the motion to

suppress, finding that "[t]here is no constitutional right to have [an identification]

done in a certain way."  (*Id.*)

Both Luster and Olsen testified at trial.  Luster again identified Salter as the

shooter.  The jury convicted Salter of first-degree murder, two counts of assault

with intent to murder, and one count of felony-firearm on December 8, 2003. (ECF No. 36, PageID.685).  He was sentenced to a term of life imprisonment without parole.  (*Id.*).

Almost fifteen years later, the Conviction Integrity Unit ("CIU") of the Wayne County Prosecutor's Office began reviewing Salter's claims of innocence. (*Id.*).  According to Salter, a new closeup photo of Earland "E" Collins was discovered upon review of his DPD file.  (ECF No. 36-13).  Attorney Colleen Fitzharris, one of Salter's attorneys from the Federal Defender Office, received attorney Harris' file as part of her appellate investigation and she attested to the fact in her affidavit that the photograph was not part of that file.  (ECF No. 36-17, C. Fitzharris affidavit, ¶ 6).[3]  Added to that fact is the trial prosecutor's testimony that if the larger photo of Collins had been provided to her, she would have produced it to the defense.  (ECF No. 36-16, PageID.924, pp. 27-28).  The CIU also interviewed Olsen.  (ECF No. 36-18).  Olsen said he thought the case "always stunk."  (*Id.* at PageID.930).  He "just presented what [he] had" and "never thought it would be a conviction."  (*Id.*)

---

[3]  Salter also cites paragraphs 5 and 6 of the affidavit of his defense attorney, Harris, in support of this proposition.  (ECF No. 36-15).  However, the complete affidavit was not submitted; only the third page, which does not includes the paragraphs identified, appears in the record.  Nevertheless, in paragraph 8 of the affidavit, Harris seems to allude to an absence of the photos at trial where he states, "Having the large photo of Earland Collins at the trial *would have* allowed me to cross-examine the lead detective…more effectively," and "Having the photo of a stronger suspect…*would have* called into question the integrity of the homicide investigation in this case."  (*Id.*) (*emphasis supplied*).

As a result of the CIU investigation, the state court vacated Salter's

conviction and dismissed the case pursuant to the parties' stipulation on August 15,

2018. (ECF No. 36-22).

## III. DISCUSSION

### A. Standard of Review

When a party files a motion for summary judgment, it must be granted "if

the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party

asserting that a fact cannot be or is genuinely disputed must support the assertion

by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that

the materials cited do not establish the absence or presence of a genuine dispute, or

that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1). The standard for determining whether summary judgment

is appropriate is "whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d

433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

251–52 (1986)). Furthermore, the evidence and all reasonable inferences must be

construed in the light most favorable to the non-moving party. *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and to do so must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'" *Brown v. Scott*, 329 F. Supp. 2d 905, 910 (6th Cir. 2004). In order to fulfill this burden, the non-moving party only needs to demonstrate the minimal standard that a jury could ostensibly find in his favor. *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 251.

The court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Such a determination requires that the court "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the case. *Id*. at 254. Thus, if the plaintiff must ultimately prove its case at trial by a preponderance of

the evidence, on a motion for summary judgment the court must determine whether a jury could reasonably find that the plaintiff's factual contentions are true by a preponderance of the evidence.  *See id.* at 252–53.  Finally, if the nonmoving party fails to make a sufficient showing on an essential element of its case for which it carries the burden of proof, the movant is entitled to summary judgment.  *Celotex*, 477 U.S. at 323.  The court must construe Rule 56 with due regard not only for the rights of those "asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury," but also for the rights of those "opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis."  *Id*. at 327.

### B.    Qualified Immunity – Legal Standard

Olsen argues that he is entitled to qualified immunity from Salter's § 1983 claims of constitutional violations.  The doctrine of qualified immunity means that "'[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Caldwell v. Moore*, 968 F.2d 595, 599 (6th Cir. 1992) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Defendants bear the burden of pleading qualified immunity, but plaintiff bears the burden of showing that the defendant's conduct violated a right so clearly established that a reasonable official

in his or her position would have clearly understood that he or she was under an affirmative duty to refrain from such conduct. *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002) (citation omitted) (explaining that "[t]he ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity").

The Supreme Court has established a two-part test to determine whether qualified immunity applies. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The first part of the test involves a determination of whether the facts of the case, viewed in the light most favorable to the plaintiff, "show the officer's conduct violated a constitutional right." *Id*. If the first question is resolved in the affirmative, then the court should decide "whether the right was clearly established." *Id*.

"[C]learly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotations omitted). The right must be defined at the appropriate level of specificity to determine whether it was clearly established at the time the defendants acted. *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). Indeed, "courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that

he or she faced.'"  *Moderwell v. Cuyahoga Cnty., Ohio*, 997 F.3d 653, 660 (6th

Cir. 2021) (quoting *Wesby*, 138 S. Ct. at 590).  On the other hand, it "defeats the

purpose of § 1983 to define the right too narrowly (as the right to be free of

needless assaults by left-handed police officers during Tuesday siestas)."  *Hagans

v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 508–09 (6th Cir. 2012).  An

official action, therefore, need not have previously been held unlawful, but "in the

light of pre-existing law the unlawfulness must be apparent."  *Wilson*, 526 U.S. at

615 (quoting *Anderson*, 483 U.S. at 640).

Typically, "[a] clearly established constitutional violation requires on-point,

controlling authority or a robust consensus of cases of persuasive authority."

*Ortega v. U.S. Immigr. and Customs Enf't*, 737 F.3d 435, 439 (6th Cir. 2013).  "In

determining whether a right was clearly established, we look first to decisions of

the Supreme Court, then to our own precedents, and then to decisions of other

courts of appeal, and we ask whether these precedents 'placed the … constitutional

question beyond debate.'"  *Hearring v. Sliwowski*, 712 F.3d 275, 280 (6th Cir.

2013) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  In rare

circumstances, however, "the Supreme Court has held that there does not need to

be a case directly on point."  *Moderwell*, 997 F.3d at 660 (citing *Taylor v. Riojas*,

151 S. Ct. 52, 53 (2020).  "[T]here can be the rare 'obvious case,' where the

unlawfulness of the officer's conduct is sufficiently clear even though existing

precedent does not address similar circumstances." *Id.* (quoting *Wesby*, 138 S. Ct. at 590).

If both parts of the qualified immunity test are resolved in the affirmative, then the doctrine of qualified immunity does not apply, and the case can proceed. The court may address the two factors in whichever order it deems appropriate based on several factors, not the least of which is judicial economy. *Pearson v. Callahan*, 555 U.S. 223, 227 (2009). As the Sixth Circuit has observed, "[t]his generally means that 'we are free to consider those questions in whatever order is appropriate in light of the issues before us.'" *Jones v. Byrnes*, 585 F.3d 971, 975 (6th Cir. 2009) (quoting *Moldowan v. City of Warren*, 570 F.3d 698, 720 (6th Cir. 2009)).

C.   Fabrication of Evidence

A plaintiff may raise a claim for fabrication of evidence under the Fourth Amendment and Due Process Clause of the Fourteenth Amendment. Salter appears to raise both. "A Fourth Amendment claim for fabrication of evidence lies where a defendant knowingly manufactures probable cause, thereby effecting a seizure." *Robertson v. Lucas*, 753 F.3d 606, 616 n.5 (6th Cir. 2014). "The Due Process Clause of the Fourteenth Amendment is also 'violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury.'" *Jackson v. City of Cleveland*, 925

F.3d 793, 815 (6th Cir. 2019) (quoting *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006)).

"A claim of fabricated evidence is a constitutional tort distinct from malicious prosecution, and can be shown without proving that the state lacked probable cause." *Morris v. Boyd*, 283 F.3d 422, at \*3 (Table) (6th Cir. 2000). "[T]he relevant question is not whether the fabricated evidence was *shown* to the jury; it is whether the statement *affected* the decision of the jury." *Jackson*, 925 F.3d at 816. "For example, a fabricated search warrant affidavit, used to obtain evidence later shown to the jury, can form the basis for a fabrication-of-evidence suit," or "fabricated evidence that 'is used as [the] basis for a criminal charge' can form the basis for a § 1983 claim because, absent that evidence, there would have been no jury." *Id.* (quoting *Halsey v. Pfeiffer*, 750 F.3d 273, 294 n.19 (3d Cir. 2014)).

Olsen does not address Salter's fabrication-of-evidence claim in his motion for summary judgment but instead discusses it for the first time in his reply brief. Typically, issues raised for the first time in a reply brief are waived. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008). This is because "reply briefs *reply* to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration" and "the non-moving party ordinarily has no right to respond to the

reply brief, at least not until oral argument." *Id.* (quoting *Novosteel SA v. U.S.*

*Bethlehem Steel Corp.*, 284 F.3d 1261, 1274 (Fed. Cir. 2002)).  But because Salter

addressed his fabrication-of-evidence claim in his response brief and discussed the

issue at oral argument, the court will consider Olsen's argument.

In his response brief, Salter argues that Olsen's "illegal photo identification

procedure constitutes fabricated evidence that manufactured probable cause for the

arrest." (ECF No. 36, PageID.701).  Salter also claims that because Olsen showed

Luster a photo array with Earland Collins in it and because Salter's physical

characteristics "did not come close to Jamar Luster's description of the shooters," a

reasonable jury could infer that Olsen "knowingly 'created' evidence that would

not have been obtained otherwise and manufactured probable cause for Plaintiff's

arrest and subsequent conviction." (*Id.* at PageID.701–04).  Olsen replies that this

claim is an "attempt to couch the claim for unduly suggestive photo identification

procedures in terms of fabricating evidence." (ECF No. 37, PageID.1013).  Olsen

argues that the identification was not unduly suggestive in any event. (*Id.* at 1013–

14).  He also argues that no evidence supports the inference that Olsen fabricated

evidence. (*Id.* at 1014–15).

Salter argues that his "right not to be prosecuted or convicted based on

fabricated evidence was clearly established long before August of 2003," under

both *Jackson*, 925 F.3d 793, and *Spurlock v. Satterfield*, 167 F.3d 995 (6th Cir.

1999).  While this is an accurate statement of the law, Salter does not adequately show that a reasonable jury could find that Olsen's actions constituted a fabrication of evidence.  That is, Salter does not show that he can satisfy the first prong of the qualified immunity test – that Olsen violated his constitutional rights through a fabrication of evidence.  Indeed, the Sixth Circuit has suggested that a single-photo identification may not be the basis for a fabrication-of-evidence claim.  *See France v. Lucas*, 836 F.3d 612, 630 (6th Cir. 2016) ("While we disapprove of the officers' use of a single photo labeled with a suspect's name to identify France— particularly a sixth grade photo from years before—the evidence was not fabricated and cannot serve as the basis for a fabrication of evidence claim.").  In *France*, the suspect's first name was identified as "Geneva" and the police officer located a sixth grade photo of France, which was not placed in a photo array and may have been captioned with the name "Geneva France" when shown to the witness.  *Id*. at 619.  The Sixth Circuit found that the officer's only action was to provide an "accurate, if outdated photo" of the suspect and this could not sustain a fabrication of evidence claim.  *Id.*  Just as in *France*, the photo itself was an accurate depiction of Salter and thus, cannot support a fabrication of evidence claim.

Moreover, the facts in *Jackson* and *Spurlock* are largely inapposite to the present circumstances because they both addressed conduct involving influencing a

18

witness to agree to particular facts based on threats or intimidation.  For instance,

in *Jackson*, when a 12-year-old witness failed to identify the plaintiffs in a lineup

as the perpetrators of a crime, officers "accused [the witness] of lying, threatened

to send his parents to jail for perjury, banged on a table, and used racial pejoratives

to describe [him]."  925 F.3d at 804.  They then presented the witness a statement

that explained that he had failed to identify the perpetrators because he feared their

retaliation, which he signed.  *Id.*  Later, the witness also explained to officers that

he had not witnessed the crime; they yelled at him again and threatened to send his

parents to jail for perjury.  *Id.* at 804–05.  The officers' tactics led the child to

agree to testify at trial that he had seen the crime.  *Id.* at 805.  Similarly, in

*Spurlock*, officers tampered with a witness; in an alleged scheme to collect reward

money in a murder case, officers used threats and promises of release from jail to

get an informant to implicate the plaintiffs in the murder.  167 F.3d at 998–99.  In

both cases, the Sixth Circuit found that officers fabricated evidence through threats

and intimidation in violation of clearly established law.  In contrast, Salter does not

allege any threats or intimidation, rendering his reliance on these cases

questionable.  Indeed, neither case addressed whether the use of a single-photo

identification constitutes fabricated evidence.  Nor is Olsen's conduct analogous to

the egregious tampering present in those cases.  *Cf. Jackson*, 925 F.3d at 825 ("The

obvious injustice inherent in fabricating evidence to convict three innocent men of

a capital offense put Stoiker on notice that his conduct was unlawful.").  Given the Sixth Circuit's admonition that a single photo identification in and of itself does not constitute a fabrication of evidence, the court concludes that a reasonable jury could not find that Olsen fabricated evidence based upon the use of such a method here.  Accordingly, Salter has not established the existence of a genuine issue of material fact as to this claim and it fails.  Based on the foregoing conclusion, the court need not address the second prong of the qualified immunity analysis.

   D.   <u>False Arrest and Malicious Prosecution</u>

   Section 1983 claims based on theories of false arrest/false imprisonment and malicious prosecution derive from the Fourth Amendment and turn on the question of probable cause.  *France*, 836 F.3d at 626 ("A malicious prosecution claim under § 1983 fails "when there was probable cause to prosecute.") (internal quotation marks and citation omitted); *Stemler v. City of Florence*, 126 F.3d 856, 871–72 (6th Cir. 1997) (finding the existence of probable cause for arrest forecloses false arrest claims); *Gregory v. City of Louisville*, 444 F.3d 725, 748-49 (6th Cir. 2006) (cause of action for "malicious prosecution" under § 1983 is actually a Fourth Amendment claim to be free from pretrial detention without probable cause).  The same is true under Michigan law.  *See Blase v. Appicelli*, 195 Mich.App. 174, 177-178 (1992) ("[o]ne element that the plaintiff must prove to succeed on an action for malicious prosecution is the absence of probable cause for the proceedings").

Thus, Salter's state law claim for malicious prosecution also turns on the question of probable cause. *Id.*

As the Sixth Circuit has observed, "A [police officer] is entitled to qualified immunity" on a false arrest and false imprisonment claim "if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the [police officer]." *Kennedy v. City of Villa Hills*, 635 F.3d 210, 214 (6th Cir. 2011). Probable cause to arrest exists if there are "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979); *Thacker*, 328 F.3d at 260 ("Insofar as the question of probable cause here is a close one, reasonable officials could disagree as to whether probable cause existed. Thus, the defendant officers are entitled to qualified immunity on Thacker's Fourth Amendment seizure claim.") (internal citations omitted)). Accordingly, whether there was a constitutional violation or state law violation giving rise to plaintiff's claims of false arrest/illegal seizure and false imprisonment depends on whether the arresting officer(s) had probable cause to arrest and whether probable cause was found at the preliminary examination hearing. The law in this circuit establishes that "[a]n eyewitness identification—

standing alone—is sufficient to establish probable cause unless the officer has some reason to believe at the time of the arrest that the eyewitness is lying or mistaken." *Thomas v. Noder-Love*, 621 F. App'x. 825, 832 (6th Cir. 2015) (citing *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999)); *see also Thacker v. City of Colombus*, 328 F.3d 244, 257 (6th Cir. 2003) (explaining that a victim's accusations alone without a statement from accused was sufficient for probable cause).

Olson argues that Salter's claim for false arrest fails because "[a] valid warrant was issued for plaintiff's arrest based on probable cause established through the eyewitness identification of plaintiff by Jamar Luster." (ECF No. 29, PageID.376). And, according to Olsen, "[t]here is no evidence that Investigator Olsen intentionally or recklessly made material misrepresentation in the Investigator's Report for the warrant request in an effort to manufacture probable cause." (*Id.* at PageID.376–77). Hence, Olsen contests two elements of Salter's malicious prosecution claims for similar reasons. He first argues that Salter fails to establish the absence of probable cause. (ECF No. 29, PageID.377). Olsen contends that Luster's identification of Salter as the shooter was enough by itself to support probable cause for the arrest warrant. (*Id.* at 376–77). Second, he argues that there is no evidence that he made, influenced, or participated in the decision to prosecute; instead, he participated in a passive and neutral way by merely

investigating and submitting a warrant request.  (*Id.* at 378).  Salter does not seem to directly address Olsen's arguments as to the false arrest claim, but he does dispute probable cause.  Accordingly, the court will address this argument as to both the false arrest and malicious prosecution claims.

Relying on *Sykes v. Anderson*, 625 F.3d 294, 312 (6th Cir. 2010), Salter argues that "a police officer violates a person's Fourth Amendment right to be free from illegal seizure and prosecution when the officer makes deliberate or reckless falsehoods in sworn statements or investigatory materials that result in arrest and prosecution without probable cause."  (ECF No. 36, PageID.690).  In *Sykes*, the court examined whether probable cause supported the plaintiff's arrest and prosecution.  *Id.*  "Because an arrest based on a facially valid warrant approved by a magistrate provides a complete defense, *Voyticky*, 412 F.3d at 677, in order to prevail on a false-arrest claim, [the plaintiff] was required to prove by a preponderance of the evidence that in order to procure the warrant, [the defendant] 'knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood' and 'such statements or omissions [we]re material, or necessary, to the finding of probable cause.'"  *Sykes*, 625 F.3d at 305 (quoting *Wilson v. Russo*, 212 F.3d 781, 786–87 (3d Cir. 2000) (internal quotation marks omitted).  Based on *Sykes*, Salter is faced with the obstacles of a facially valid warrant and a finding of probable cause at the

preliminary examination.  To defeat these obstacles, Salter must show that Olsen

made false statements that were material to the finding of probable cause.   This

proves to be a bridge too far under the facts here presented.

The present case is similar to that of *Siggers v. Alex*, 2021 WL 4391170,

*16-17 (E.D. Mich. Sept. 24, 2021) in which the court also analyzed whether the

plaintiff presented evidence to overcome a finding of probable cause at a

preliminary examination hearing.  In *Siggers*, the court had first rejected the

plaintiff's Fourteenth Amendment fabrication of evidence claim for failure to raise

a triable issue of fact.  *Id.*  And because the plaintiff's malicious prosecution claim

was based on the same alleged fabrication of evidence, the court found that his

malicious prosecution claim also failed:

> Because Siggers is unable to show that Alex fabricated
> evidence, he necessarily cannot show that the prosecution
> lacked probable cause.  Absent the requisite showing of a
> lack of probable clause, Siggers's entire malicious
> prosecution claim fails.

*Id*. at *17.  Here, Salter's false arrest and malicious prosecution claims are both

based on the purported fabrication of evidence relating to the single photo

identification.  Yet, as discussed above, use of the subject single photo does not

constitute a fabrication of evidence in the circumstances presented here.  Thus, like

*Siggers*, the false arrest and malicious prosecution claims fail because Salter

cannot show that Olsen made any false statements that were material to the

probable cause finding.  Thus, the probable cause findings made at the preliminary

examination and by the judge who issued the arrest warrant are not invalidated.

Given the court's conclusion on the first prong of the qualified immunity test, the

court need not address the second prong of the qualified immunity analysis.

      E.    <u>Fourteenth Amendment Due Process</u>

        *1.*    *Brady*

The Supreme Court has held that the failure to provide exculpatory evidence

to the accused violates due process.  *Brady v. Maryland*, 373 U.S. 83 (1963).  A

*Brady* claim has three elements: (1) "the evidence at issue must be favorable to the

accused, either because it is exculpatory, or because it is impeaching"; (2) "that

evidence must have been suppressed by the State, either willfully or

inadvertently"; and (3) "prejudice must have ensued."  *Strickler v. Greene*, 527

U.S. 263, 281-82 (1999).  "To show prejudice, Plaintiffs must show that the

allegedly suppressed evidence was 'material.'"  *Jackson*, 925 F.3d at 815.  "[I]n

other words, 'that there is a reasonable probability that the suppressed evidence

would have produced a different verdict.'"  *Id.* (quoting *Strickler*, 527 U.S. at 280).

Such a claim is cognizable under § 1983.  *See Sykes v. Anderson*, 625 F.3d 294,

319 (6th Cir. 2010) (citing *Moldowan v. City of Warren*, 578 F.3d 351, 381 (6th

Cir. 2009) ("[T]he due process guarantees recognized in *Brady* also impose an

analogous or derivative obligation on the police," and a violation of that obligation

can result in civil liability.).

While the facts in *Brady* involved the actions of prosecutors, the Sixth Circuit has also concluded that the "police can commit a constitutional deprivation analogous to that recognized in *Brady* by withholding or suppressing exculpatory material." *Jackson*, 925 F.3d at 814.  Yet and still, "*Brady* requires a police officer to disclose evidence to the prosecutor only when its exculpatory value is 'apparent' to the officer." *D'Ambrosio v. Marino*, 747 F.3d 378, 389 (6th Cir. 2014). Exculpatory value is "apparent" when "the officer is aware that the evidence 'could form a basis for exonerating the defendant.'" *Id.* at 390 (quoting *Moldowan v. City of Warren*, 578 F.3d 351, 388 n.14 (6th Cir. 2009)).

Salter argues that a closeup photo of Collins in the homicide file was material evidence that was not turned over to the prosecutor and thus to the defense.  (ECF No. 36, PageID.709-19).  Salter asserts that the photo is exculpatory because "it demonstrates Olsen had considered an alternate suspect as one of the shooters" and because Collins is six feet two inches and 200 pounds, which is a closer fit to Luster's description of one of the shooters.  (ECF No. 36, PageID.714 and ECF No. 36-13 (photo of Collins with height and weight information)).  Salter also argues that the photo could have been used to impeach Luster.  (*Id.* at PageID.714–17).  Salter's federal habeas attorney stated that the photo was not in the files turned over to her from Salter's trial attorney and the trial

prosecutor says that if she had the photo, she would have turned it over.  (ECF No. 36-17; ECF No. 36-16, PageID.924).  Furthermore, Luster states in an affidavit that he would have identified Collins as the taller shooter with the rifle if he had been shown the closeup photo of Collins.  (ECF No. 36-25, ¶ 4).  Salter also contends that the exculpatory and impeaching character of this evidence is further buttressed by Olsen's own admission that he believed the case against Salter was weak (as he later revealed to the CIU investigator:  "The case stinks.  It always stunk.").  (ECF No. 36, PageID.709, citing ECF No. 36-18).

Olsen argues that Salter's *Brady* claim fails because, "Mr. Salter and his attorney were not only undisputedly aware of every piece of evidence contained in Investigator Olsen's homicide file which had been turned over in a discovery pack, but were aware of who 'Rob' and 'E' were as depicted in the photo array, and of all Mr. Salter's movements and witnesses thereto up to and past the time of the subject shooting."  (ECF No. 29, PageID.381).  Olsen also contends that there is "no evidence that the subject photo was not turned over" and that it is also not material because the photo array included a photograph of Collins and because Salter was present when Collins shot his cousin Rob Carter three days before the shooting.  (ECF No. 37, PageID.1016).  Based on Olsen's arguments, he appears to challenge the second (whether the State withheld exculpatory evidence) and the third (whether the withheld evidence was material) elements of a *Brady* claim and

does not directly challenge the first element (that the evidence at issue was in fact exculpatory).  Accordingly, the court will address only those challenged elements.

Salter has presented evidence that the photograph was not produced in discovery.  Attorney Colleen Fitzharris, one of Salter's attorneys from the FDO, received attorney Harris' file as part of her appellate investigation and she testified in her affidavit that the photograph was not part of that file.  (ECF No. 36-17, C. Fitzharris affidavit, ¶ 6).  And, the trial prosecutor, testified that if the larger photo of Collins had been provided to her, she would have produced it to the defense.  (ECF No. 36-16, PageID.924, pp. 27-28).   Salter's trial attorney also affirmed that having the large photo "would have allowed" him to take certain actions at trial to question the integrity of the investigation amongst other things.  (ECF No. 36-15). It is reasonable to infer from the phrasing of Harris's statement that he, in fact, did not have the large photo during Salter's trial.[4]  And based on the combination of evidence from all three attorneys (prosecutor, defense attorney and habeas counsel), a jury could reasonably infer that the larger photo of Collins found in Olsen's file was not provided to the trial prosecutor or the defense.  Accordingly, Salter has established that there is a question of material fact regarding whether the

---

[4] As noted in FN3, Salter also relies on statements in Harris's affidavit in which Harris presumably directly asserts that he did not receive the photo.  But the paragraphs of Harris's affidavit to which Salter refers the court for this specific assertion are missing from the record, so the court cannot and does not rely on the referenced paragraphs.  (*See* ECF No. 36, PageID.686 and ECF No. 36-15).

photograph was withheld by the State.

The court must now determine whether Salter has created a genuine issue of material fact regarding the materiality of the photograph, or prejudice.  "Evidence is material (and so shows prejudice) if there is a 'reasonable probability ... that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  *McNeill v. Bagley*, 10 F.4th 588 (6th Cir. 2021) (quoting *Jells v. Mitchell*, 538 F.3d 478, 501-02 (6th Cir. 2008)).  To demonstrate such a reasonable probability, a plaintiff must "sufficiently undermine[ ] confidence in the outcome of the trial."  *Id*. (quoting *Jells*, 538 F.3d at 502).  The court must "evaluate evidence as a whole, rather than on an individual basis, in order to determine whether it was material."  *Id*. (citing *Kyles v. Whitley*, 514 U.S. 419, 436 (1995)).  However, "there is no *Brady* violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from another source."  *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007).  Olsen maintains that Salter had sufficient knowledge of essential facts to develop his theory that Collins was the shooter.  He points out that the defense was aware that Luster had given a statement that Collins had shot up the same house about a month before the subject shooting, (ECF No. 36-2, PageID.726) and that Collins shot his cousin, Robert Clark.  (ECF No. 29-15, PageID.497–98).

29

These facts stand in contrast to the facts, if believed by a jury, that are now in the record pointing directly to Collins being the taller shooter with the rifle instead of Salter. Luster has stated in his affidavit that if he had seen the larger photo of Collins, he would have identified him as the taller shooter with the rifle. (ECF No. 36-25). Further, at his deposition, Luster testified that he picked "E" out of the photo array as a shooter and told Olsen that "E" was one of the shooters. (ECF No. 36-7, PageID.786, p. 38). The defense did not have either the larger photo of Collins or the important context provided by Luster's testimony – that he did identify Collins as one of the shooters from the photo array. Viewed in the light most favorable to Salter, this testimony supports a reasonable probability that the outcome of the trial would have been different had the larger photo been turned over and had Luster's identification of "E" as one of the shooters been given to the defense. And the facts known to Salter—that Collins was involved in two other shootings—are simply not the same as the evidence that Luster identified Collins as one of the shooters at the house on Parkgrove Street on the night in question. Hence, knowledge of this evidence is not sufficient to show that Salter "knew or should have known the essential facts permitting him to take advantage of the information in question." *Graham*, *supra*. Luster's identification of "E" as a shooter also supports the conclusion that the exculpatory nature of the photo of Collins would have been apparent to Olsen, and the exculpatory and impeaching

nature of Luster's identification of "E" as a shooter is readily apparent.  Given

these material questions of fact, Salter's *Brady* claim is entitled to consideration by

a jury.[5]

## 2.    *Unduly Suggestive Identification*

"[C]onvictions based on eyewitness identification at trial following a pretrial

identification by photograph will be set aside on that ground only if the

photographic identification procedure was so impermissibly suggestive as to give

rise to a very substantial likelihood of irreparable misidentification."  *Simmons v.*

*United States*, 390 U.S. 377, 384 (1968).  To determine whether an identification

was admissible, the court performs a two-part analysis.  First, the court assesses

"whether the identification was unnecessarily suggestive."  *Haliym v. Mitchell*, 492

F.3d 680, 704 (6th Cir. 2007).  Second, if so, the court considers "whether the

evidence was nevertheless reliable despite the impermissible suggestiveness of the

identification procedure."  *Id.*  The Supreme Court has set forth five factors to

consider in determining whether the suggestive identification was still reliable: (1)

the witness's opportunity to view the suspect; (2) the witness's degree of attention;

(3) the accuracy of the witness's prior description of the criminal; (4) the level of

---

[5] Olsen does not dispute that it was clearly established at the time of the events in question that Salter had right to not have exculpatory/impeachment evidence withheld from him. (ECF No. 29, PageID.389).  Olsen is correct.  *See Strickler v. Greene*, 527 U.S. 263, 280–81 (1999) (internal quotation marks and citation omitted) (*Brady* requires the disclosure to the defense even of "evidence known only to police investigators and not to the prosecutor.").

certainty demonstrated by the witness at the time of the identification; and (5) the time between the crime and the identification.  *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).  An officer may be liable for an unduly suggestive identification used by a prosecutor if the officer "reasonably should have known that the use of the identification would lead to a violation of [the plaintiff's] right to a fair trial." *Gregory v. City of Louisville*, 444 F.3d 725, 747 (6th Cir. 2006).

As a preliminary matter, Olsen argues that Salter is collaterally estopped under Michigan law from challenging Luster's identification as unduly suggestive. (ECF No. 29, PageID.382-87).  "Under the Full Faith and Credit Act, 28 U.S.C. § 1738, federal courts are required to 'give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so.'"  *Peterson v. Heymes*, 931 F.3d 546, 554 (6th Cir. 2019) (quoting *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984)).  The court looks to state law to determine whether a judgment gets preclusive effect.  *Id.* "Michigan law allows 'crossover estoppel,' which precludes the relitigation of an issue from a criminal proceeding in a subsequent civil proceeding, and vice versa." *Id.*  "In Michigan, collateral estoppel applies when: (1) an issue has been actually litigated and determined by a valid and final judgment; (2) the same parties have had a full and fair opportunity to litigate the issue; and (3) there is mutuality of estoppel."  *Id.*  But "mutuality is not required when collateral estoppel is being

invoked defensively." *Id.*

Olsen contends that the state court already ruled that Luster's identification was constitutional at Salter's preliminary examination during his criminal proceedings.  In support, Olsen points out that, at the end of the preliminary examination, Salter's trial attorney moved to suppress the identification because of Olsen's single photo show-up.  (ECF No. 29-8, PageID.463).  The prosecutor argued that suppression was not warranted because Luster knew Salter and had seen him in the past.  (*Id.* at PageID.464).  Thus, use of the single photo was not unduly suggestive.  The state court ruled from the bench that the identification was permissible because "[t]here is no constitutional right to have it done in a certain way."  (*Id.*)

Olsen relies on *Hatchett v. City of Detroit*, which held that a plaintiff in a § 1983 case was collaterally estopped from relitigating the voluntariness of his confession.  714 F. Supp. 2d 708 (E.D. Mich. 2010), *aff'd* 495 F. App'x 567 (6th Cir. 2012).  In that case, the plaintiff had been convicted and sentenced to 25 to 40 years in prison.  *Id.* at 710.  The plaintiff was released over eleven years later when it came to light that a DNA test was not disclosed to the defense.  *Id.*  In his later § 1983 lawsuit, the plaintiff alleged, in part, that his confession had been coerced. *Id.* at 714.  The defendant in *Hatchett* made the same argument Olsen does here: that the plaintiff was collaterally estopped from raising the issue of the confession.

*Id.* During the plaintiff's criminal proceedings, the state trial court had held a hearing where it determined that his confession was voluntary, and that ruling was not appealed. *Id.* at 714–15. Even though the validity of his conviction was called into question, the court held that the plaintiff was collaterally estopped from challenging the voluntariness of his confession under § 1983. The Sixth Circuit affirmed, noting that "under Michigan law, a determination of voluntariness is separate from a determination of guilt." 495 F. App'x at 571.

Salter, on the other hand, argues that the vacating of his sentence by stipulation and the dismissal of the charges stripped his conviction and any rulings leading up to it of their preclusive effect. Salter cites *Peterson v. Heymes*, 931 F.3d 546 (6th Cir. 2019) for support. In *Peterson*, the § 1983 plaintiff had been convicted of murder and rape. Based on new DNA test results in 2013, the court vacated plaintiff's conviction and granted him a new trial; the prosecution dismissed the charges. *Id.* at 552. The court addressed the same argument as in *Hatchett* but came to the opposite conclusion. The court held that "vacated rulings have no preclusive effect under Michigan law." *Id.* at 554. In responding to the defendant's reliance on *Hatchett*, the court noted that it was an unpublished decision and that "it was not clear that the criminal judgment had actually been vacated." *Id.*

This court is bound by the published decision in *Peterson*. Like the plaintiff

in *Peterson*, Salter's conviction has been vacated.  (ECF No. 36-22).  Therefore,

the state court's ruling on the constitutionality of his identification—even if it met

all the elements for collateral estoppel—does not have preclusive effect.  *See also*

*Siggers v. Alex*, 2021 WL 4391170, *5-6 (E.D. Mich. Sept. 24, 2021) (Pre-trial and

post-judgment rulings by a state court do not have any preclusive effect after the

criminal conviction on which they are based has been vacated.).

    The court thus turns to the constitutionality of Luster's identification.  Olsen

argues that even if collateral estoppel does not apply, "there was sufficient

testimony from Jamar Luster evidencing that he had an independent basis for

identification of Mr. Salter apart from the photograph he was shown by

Investigator Olsen."  (ECF No. 29, PageID.387).  To begin with, the court must

determine whether a reasonable jury could find that the single-photo identification

was unnecessarily suggestive.  Because Olsen does not address this prong, the

court deems the issue abandoned.  *See Security Watch, Inc. v. Sentinel Sys., Inc.*,

176 F.3d 369, 376 (6th Cir. 1999) (finding that defendants abandoned an issue by

failing to address it in its brief).  And indeed, the Supreme Court has underscored,

"[t]he practice of showing suspects singly to persons for the purpose of

identification, and not as part of a lineup, has been widely condemned."  *Stovall v.

Denno*, 388 U.S. 293, 302 (1967); *see also Gregory*, 444 F.3d at 756 ("By

presenting only a single suspect to a witness, police convey an implicit message

that 'this is the guy.'").  Although this single photo of Salter was followed by a six-photo array, (ECF No. 36-5, PageID.771), Salter was not included in the array, thus arguably suggesting to the witness at the outset that he was deserving of singular consideration.  Luster also testified that Olsen told him that the police had already "picked up the guy with the rifle" in connection with the shooting *before* showing the single photo.  (ECF No. 36-7, PageID.799).  Such a statement would exacerbate the suggestive nature of the single photo because "[i]mparting this information to the witness can lead him to assume that a photo of the arrested person will be in the array." *United States v. Saunders*, 501 F.3d 384, 391 (4th Cir. 2007).  Nor was there any need to show a single photo; as Olsen admitted at the preliminary examination, he could have used Salter's photo in a photo array.  (ECF No. 36-5, PageID.771).  As a result, the court finds that Olsen's showing of a single photo of Salter to Luster was unduly suggestive.

Next, the court must examine the *Manson* factors and consider whether a reasonable jury could find that the identification was still reliable—despite being unduly suggestive.  But Olsen makes no attempt to apply and analyze the *Manson* factors; he merely argues in general terms that there was an "independent basis" for Luster's identification.  (ECF No. 29, PageID.387; ECF No. 37, PageID.1013).  While it is not for the court to develop and support Olsen's argument for him, *see McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997), Salter has

demonstrated that there are genuine issues of material fact in dispute regardless.

First, Luster had some opportunity to view the two shooters because he turned to see them when he heard a gunshot.  (ECF No. 36-11, PageID.841).  But the shooters were a significant distance away—35 to 40 feet (ECF No. 36-9, PageID.843)—and it was dark (although Luster notes that they were under a streetlight when he first saw them), (*Id.* at PageID.821-22).  *Cf. Haliym*, 492 F.3d at 705 (finding the first *Manson* factor favors reliability because the identifier had viewed "the suspect at a reasonably close range for a period of time that was, at the least, long enough for the bulk of the crime to occur").  Furthermore, rather than having a clear, unobstructed view of the shooters, Luster states that he saw the shooters through a "little opening" in a curtain on the porch, (ECF No. 36-19); instead of seeing the shooters completely, he saw their "figures."  (ECF No. 36-7, PageID.781).  And when asked at his deposition if he had "a very good look at each of their faces," he answered, "no."  (*Id.*)  Overall, the court finds that the circumstances surrounding Luster's opportunity to view the shooters undermines the reliability of his identification of Salter from the single photo.

Second, and relatedly, Luster was minimally attentive.  "To analyze the sufficiency of an eyewitness's degree of attention, we generally examine the circumstances surrounding the witness's encounter."  *Howard v. Bouchard*, 405 F.3d 459, 473 (6th Cir. 2005).  "Generally, we place greater trust in witness

identifications made during the commission of a crime because the witness has a

reason to pay attention to the perpetrator." *Id.* As he describes it, once he heard

the shot and turned to see the shooters, he immediately jumped off the porch or

was pushed off the porch and then laid down on the side of the brick porch. (ECF

No. 36-7, PageID.781; ECF No. 36-11, PageID.841). Therefore, while he may

have had heightened attention momentarily, he immediately diverted his attention

as he tried to escape. Luster also noted that he "wasn't tryin' to look for nobody,

[he] was tryin' to get out the way." (*Id.* at PageID.842). And Luster may have

been drinking and smoking marijuana at the time of the shooting, which would

have undermined his attentiveness, although at the preliminary examination, he

had testified he had done neither. (*Compare* ECF No. 36-7, PageID.780 *with* ECF

No. 36-9, PageID.824).

Third, the accuracy of his description was significantly off. Luster stated

that one of the shooters was "Rob," whom he described as five foot seven inches

and 150 to 170 pounds. (ECF No. 36-2, PageID.725). When he was shown the

single photo Salter, he identified him as "Rob." (ECF No. 36-6, PageID.774).

Yet, Salter was six feet four inches tall and weighed 250 pounds at the time. (ECF

No. 29-8, PageID.453). Hence, as described by Luster, "Rob" was 9 inches shorter

than Salter and as much as 100 pounds lighter – significant discrepancies by any

reasonable estimation. And as the Sixth Circuit has underscored, "this Court has

never found that an identification arising from a suggestive format was anything

but *unreliable* when the witness' prior description of the suspect was significantly

inconsistent with the suspect's actual appearance." *Gregory*, 444 F.3d at 756.

Fourth, there is at least a genuine dispute regarding Luster's level of

certainty.[6]  On the one hand, Luster continued to identify Salter as the shooter at

both the preliminary examination and the trial.  (ECF No. 36-9, PageID.813; ECF

No. 36-11, PageID.839, 883).  On the other hand, Luster testified at his deposition

that he told Olsen that he was not sure that Salter was the guy, but "that's who it

looks like."  (ECF No. 36-7, PageID.786).  Luster also testified that he picked "E"

out of the photo array as a shooter and told Olsen that "E" was one of the shooters.

(ECF No. 36-7, PageID.786, p. 38), a fact which undermines the identification of

Salter from the single photo.

Fifth, the timing weighs in favor of Olsen because Luster identified Salter as

one of the shooters within several hours of the shooting.  (ECF No. 36,

PageID.697).  Indeed, courts have found significantly longer lengths of time to be

reliable.  *See e.g.*, *Howard v. Bouchard*, 405 F.3d 459, 473 (6th Cir. 2005) ("Three

months is not a great length of time between an observation and identification.").

---

[6] Even if the court found that Luster was absolutely certain in his identification, this factor would weigh less in this court's finding than the other factors.  The Sixth Circuit, while still recognizing the applicability of the certainty factor, have cautioned against the correlation between certainty and accuracy of identification.  *See Haliym*, 492 F.3d at 705 n.15 ("We note, however, that empirical evidence on eyewitness identification undercuts the hypothesis that there is a strong correlation between certainty and accuracy.").

Olsen also underscores that Luster was familiar with Salter from before the shooting.  Luster testified at the preliminary examination that he had seen Salter once or twice before and knew him from "shooting all the time," (ECF No. 36-9, PageID.818), although it turned out that it was not the same person, (ECF No. 36-7, PageID.792).  In particular, Luster had seen Salter that day when he drove past the house with people in two cars.  (ECF No. 36-11, PageID.847).  The group had waved guns toward another group of people in the front of the house where Luster was sitting.  (ECF No. 36-7, PageID.790).  Reliability "is judged under the totality of the circumstances" and is "the linchpin in determining the admissibility of identification testimony."  492 F.3d at 706.  Thus, in *Haliym*, the Sixth Circuit reasoned that "any prior acquaintance with another person substantially increases the likelihood of an accurate identification."  *Id.*  The court cautioned, however, that "problems with identification testimony may exist even where the witness is familiar with the defendant."  *Id.*  Considering Luster's prior acquaintance with Salter, the court finds that this factor weighs in favor of reliability—but only minimally.  While Luster did see Salter earlier in the day when a group of people drove by in a vehicle waving guns, it appears to have been a relatively brief encounter.  And he may have seen him one other time.  Thus, his familiarity with Salter was rather limited and under the totality of the circumstances, a reasonable juror could find that Luster's identification was too unreliable to overcome the

unduly suggestive nature of a single phone show-up.

Even if there is a question of fact regarding whether Salter's constitutional right was violated, the court must still determine whether his right was clearly established.  Salter argues that it was clearly established that a single photo identification—without any exigent circumstances—is unnecessarily suggestive, citing *Stovall*, 388 U.S. at 302.  (ECF No. 36, PageID.698).  And he points to DPD policy that prohibited the use of single photos, citing *Hope v. Pelzer*, 536 U.S. 730, 744–45 (2002); *Tennessee v. Garner*, 471 U.S. 1, 18–19 (1985); and *Martin v. City of Broadview Heights*, 712 F.3d 951 (6th Cir. 2013).  He also claims that it is clearly established that a suggestive identification where a witness's description varies significantly from the plaintiff's actual characteristics is unreliable, citing *Gregory*, 444 F.3d at 756.

The court finds that Salter has met his burden to show his right was clearly established.  As Salter correctly points out, and this court discussed above, courts have found that single-photo identifications are unnecessarily suggestive.  *See Stovall*, 388 U.S. at 302.  Olsen does not point to any exigent circumstances that warranted the single-photo identification.  Furthermore, a reasonable DPD officer would be on notice that a single-photo identification is problematic because DPD policy at the time stated that "[w]itnesses should never be shown only a photograph of the suspect."  (ECF No. 36-20, PageID.935).  To be clear, violation

of this policy on its own, as Olsen argues, does not create a constitutional violation. But this circuit has held that a department's policy may provide additional evidence—along with precedent—that officers violated clearly established law. *See Martin*, 712 F.3d at 962 (finding police department's policy regarding restraint of individuals exhibiting bizarre or agitated behavior to be "further evidence that the officers were on notice that their conduct exceeded the bounds of permissible force").

While showing a single photo on its own may not be a *per se* constitutional violation, *see Gregory*, 444 F.3d at 755, the court finds that in the totality of circumstances, a reasonable jury could find that Olsen's decision to proceed with the single photo show up was not reasonable in "light of the infirmities of the situation." *Gregory*, 444 F.3d at 746 (The Supreme Court and the Sixth Circuit require law enforcement officers to assess the constitutional restraints on police action in the circumstances of their decision *before* undertaking a show-up.). As Salter underscores, this circuit "has never found that an identification arising from a suggestive format was anything but *unreliable* when the witness' prior description of the suspect was significantly inconsistent with the suspect's actual appearance." *Gregory*, 444 F.3d at 756 (citing *Thigpen v. Cory*, 804 F.2d 893, 897 (6th Cir. 1986); *Webb v. Havener*, 549 F.2d 1081, 1086 (6th Cir. 1977); *Marshall v. Rose*, 499 F.2d 1163, 1167 (6th Cir. 1974)). Here, Luster's description was

significantly inconsistent.  He identified one of the shooters as "Rob," whom he

described as five foot seven inches and 150 to 170 pounds.  (ECF No. 36-2,

PageID.725).  After hearing Luster's description and based on "a hunch," (ECF

No. 36-5, PageID.771–72), Olson presented him with a single photo show up of

Salter who is 6'4", 250 pounds, asking him whether the person in the photo was

"Rob."  (ECF No. 36-6, PageID.774; ECF No. 29-8, PageID.453).[7]  While Olsen

testified that he was unaware of Salter's height and weight when he showed Luster

the photo, (ECF No. 36-4, PageID.751), Salter presents evidence that in 2003, the

Detroit Police Department mugshot software allowed an officer to see the height

and weight of persons in the database, among other identifying characteristics.

(ECF No. 36-8, PageID.804-805).  Olsen admits that if he had known Salter's

height and weight, he would not have shown his photo to Luster because "that

doesn't match.  He's way too big" and that a reasonable police officer would not

have shown Luster the photo of Salter with such a discrepancy between the

description and the suspect.  (ECF No. 36-4, PageID.753, 762).  A reasonable jury

could find that Luster's identification was unreliable due to this significant

discrepancy.  As a result, the court finds that a reasonable officer in 2003 would be

---

[7] Though Luster's description of the second shooter as 6' with a thin build is somewhat
closer to Salter's actual size, even it is a fair ways off.  More importantly, Luster specifically
picked Salter as "Rob," whose physical description simply cannot be reconciled with Salter's
physical characteristics.

on notice that the use of a single-photo identification along with the remarkable

discrepancy between the witness's description of the perpetrator and the

perpetrator's actual characteristics would be unconstitutional and thus, Olsen is not

entitled to qualified immunity on this claim.

Thus, as to Salter's unduly-suggestive-identification claim, Olsen's motion

for summary judgment is **DENIED**.

## IV.    CONCLUSION

For these reasons, the court **GRANTS IN PART** and **DENIES IN PART**

Olsen's motion for summary judgment.  Specifically, the court retains Salter's

*Brady* claim and his unduly-suggestive-identification claim.  All other claims are

**DISMISSED**.

**IT IS SO ORDERED**.

Date: June 2, 2022                                    s/Stephanie Dawkins Davis
                                                      Stephanie Dawkins Davis
                                                      United States District Judge